## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### Jacksonville Division

SOUTHEAST DEVELOPMENT
PARTNERS, LLC, a Florida limited
liability company; and SOUTHEAST
LAND VENTURES, LLC, a Florida
limited liability company,

       Plaintiffs/Counter-Defendants,

vs.                            3:23-cv-00846-MMH-PDB

ST. JOHNS COUNTY, FLORIDA,
a political subdivision of the State
of Florida,

       Defendant/Counter-Plaintiff,

vs.

DAY LATE ENTERPRISES, INC.,
a Florida for-profit corporation,

       Counter-Defendant.

_____/

## DEFENDANT/COUNTER-PLAINTIFF ST. JOHNS COUNTY, FLORIDA'S MOTION FOR SUMMARY JUDGMENT AND <u>MEMORANDUM OF LAW IN SUPPORT</u>

Defendant/Counter-Plaintiff, ST. JOHNS COUNTY, FLORIDA (the

"County"), by and through undersigned counsel, and pursuant to Federal Rule of

Civil Procedure 56 and Local Rule for the Middle District of Florida 3.01, moves

for summary judgment on all claims set forth in Plaintiff/Counter-Defendants'

Amended Complaint for Declaratory, Injunctive, and Other Relief, and in St. Johns County, Florida's Second Amended Counterclaim for Declaratory Judgment and Supplemental Relief, on the following basis.

## I.     STATEMENT OF PRECISE RELIEF REQUESTED AND BASIS

For the reasons set forth in the below statement of undisputed facts and memorandum of law, along with the separately filed record evidence and motion for judicial notice, the County seeks entry of an Order granting summary judgment to the County on all claims and counterclaims in this action, and entry of judgment in favor of the County.

## II.     STATEMENT OF UNDISPUTED FACTS

### A. Procedural Background.

The underlying dispute in this matter stems from the County's February 21, 2023, decision to deny a request of Southeast Development Partners, LLC ("SEDP") to amend the Concurrency and Impact Fee Credit Agreement (the "Concurrency Agreement" or the "Agreement") entered into by these two parties on September 21, 2018, and decision to find SEDP in default of its contractual obligations.  Plaintiff SEDP, along with Southeast Land Ventures, LLC ("SELV"), assignee to SEDP's development rights under the Agreement, seek a declaration that the County's contract default finding involving SEDP was improper (Count I), and also assert claims for breach of contract and injunctive relief (Count II), inverse condemnation

2

(Count III), and violations of due process under 42 U.S.C. § 1983 (Count IV).  (Doc. 5).  The County filed a counterclaim against Plaintiffs and Day Late Enterprises, LLC ("Day Late"), the owner of the real property.  (Doc. 31).  Numerous affirmative defenses have also been raised by the County as to Counts I–IV, and by Plaintiffs as to the counterclaims.  (Docs. 16, 34, 35).  Counter-Defendant Day Late filed a Motion to Dismiss on January 17, 2024, and the County responded on February 6, 2024.  (Docs. 33, 37).  The Court has not ruled on the Motion to Dismiss.

**B. The Grand Oaks Development Approval and Traffic Impacts Mitigation.**

On September 19, 2016, SEDP applied to the County for a large-scale Comprehensive Plan amendment for the Grand Oaks Planned Unit Development (the "Grand Oaks PUD").  (Ex. No. 3-Hyatt Tr. 35:22–38:3, (ex.1)).[1]  The application proposed development of approximately 524 acres on State Road 16 ("SR 16") owned by Day Late (the "Property").  SEDP was identified as the contract purchaser of the Property.  (Id.).  With Day Late's authorization, SEDP proposed a mixed-use project including a maximum of 999 residential units, 100,000 square feet of commercial space, and 50,000 square feet of office space (the "Development Entitlements").  (Id.).

---

[1] The various deposition transcripts are referred to by Exhibit number ("Ex. No.__"), followed by the deponent's name and Tr., the page and line designation, and any attached deposition exhibits (ex.__).

SEDP needed three separate approvals from the County's Board of County Commissioners ("BOCC") to secure the desired Development Entitlements for the Grand Oaks PUD.  (Ex. Nos. 11(B), 11(E)).  First, the Comprehensive Plan Future Land Use Map ("FLUM") and text had to be amended to change the Property from Rural/Silviculture designation (R/S) to Residential C (RES-C), and to set forth the Development Entitles (the "Plan Amendment").  (Id.).  Second, the BOCC would also need to approve a rezoning from Open Rural (OR) to PUD to allow for development consistent with the Development Entitlements.  (Id.).  Third, a Concurrency Agreement was needed, under the County's Land Development Code ("LDC"), due to impacts on the transportation system.  (Ex. Nos. 11(C), 11(E), 11(I)).  The Grand Oaks PUD was projected to generate a total of 1,099 new external P.M. peak hour trips and would create significant adverse impacts to several roadway segments, including various segments of SR 16, the immediate access road for the development.  (Ex. No. 11(C)).  The Concurrency Agreement was needed to set forth SEDP's obligations to mitigate these impacts.  (Id.).  SEDP's traffic consultant, Chindalur Traffic Solutions, Inc. ("Chindalur"), provided a traffic assessment addressing the extent of these impacts, and ultimately calculated and submitted to the County a proportionate share amount of $10,132,643, reflecting SEDP's share of the estimated cost to remedy the transportation deficiencies attributable to the Grand Oaks PUD. (Ex. No. 10-Chindalur Tr. 24:6–25:15, (ex. 5);

4

33:20–34:24; 68:4–75:5, (ex. 29, 30, 31, 32); 75:6–80:13, (ex. 18)).

In addition to a proportionate share amount, pursuant to section A.1.2.7 of the Land Use Element of the County's Comprehensive Plan, a developer who seeks to amend the designation for "not Development Areas" such as the R/S Property here, to add development areas, must demonstrate a public benefit from the proposed amendment.  (Ex. No. 17-Land Use Element, Comprehensive Plan, p. 3). The Comprehensive Plan allows flexibility by which to demonstrate this public benefit.

Under Florida law and the Concurrency Management provisions of the County's LDC, SEDP could elect to pay the proportionate share amount as full mitigation of its transportation impacts.  (Ex. No. 6-Nguyen Tr. 73:4–73:20; 116:6–118:7).  However, to satisfy its proportionate share requirement and to demonstrate a public benefit, SEDP voluntarily proposed to widen approximately three miles of SR 16 from two lanes to four lanes, from San Giacomo Road to the eastern project entrance (the "SR 16 Improvements").  (Ex. No. 6-Nguyen Tr. 89:24–91:19).  The SR 16 Improvements as mitigation were set forth in SEDP's June 20, 2018, application to the County. (Ex. No. 11(A), 11(C); Ex. No. 8-Avery-Smith Tr. 94:19–95:22, (ex. 28)).  SEDP proposed that, of the approximately $15,000,000 estimated cost of the SR 16 Improvements at the time, $10,132,643 would be considered SEDP's proportionate share contribution and the balance, estimated as $4,867,357, would constitute its public benefit contribution.  (Ex. Nos. 11(C), 11(I); Ex. No. 10-

Chindalur Tr. 68:4–75:5, (ex. 29, 30, 31, 32); 75:6–80:13, (ex. 18)).

The BOCC considered an Agenda Item and Staff Report for final approval of the Agreement at its July 17, 2018, meeting.  (Ex. No. 11(C)).  The staff report summarized SEDP's proposal in the Agreement to widen the approximately three miles of SR 16 at an estimated cost of $15,013,392, and stated the "improvements must be constructed, however, *regardless of cost*."  (Id.) (emphasis added).  Counsel for SEDP was able to review the publicly available staff report prior to the BOCC meeting and did not raise any objections to the description of SEDP's obligation.  (Ex. Nos. 11(C), 11(I); Ex. No. 8-Avery-Smith Tr. 101:23–104:22, (ex. 17)).

During the presentation by SEDP's Counsel, then-Commissioner Morris specifically asked whether SEDP's obligation to construct the SR 16 Improvements was guaranteed, even if the actual cost ended up greater than the $15,000,000 estimate.  Counsel for SEDP responded:

> And yes, Commissioner Morris, that document says that if this road -- if the estimate is 15 million and it cost $20 million to build, they have to spend $20 million to build it. *It is the developer's risk.*

(Ex. No. 15-TR 31:22–33:2) (emphasis added).  Both SEDP and SELV agreed that the statements of Counsel were correct.  (Ex. No. 3-Hyatt Tr. 100:5–107:2; 110:14–110:19; 116:23–117:11; Ex. No. 8-Avery-Smith Tr. 111:15–118:1, (ex. 19); Ex. No. 4-Harris Tr. 73.1–79:16, (ex. 14)).  On that basis, the BOCC approved the Plan

6

Amendment, the PUD Rezoning, and the Concurrency Agreement.  (Ex. No.  11(E)).

**C. SEDP's Obligations Under the Concurrency Agreement.**

After BOCC approval, SEDP and the County entered into the Concurrency Agreement on September 21, 2018.  The Agreement specifically provides SEDP is obligated to construct the SR 16 Improvements.   The "Whereas" clauses incorporated by reference into the body of the Agreement, and accepted by the parties as true and correct, provide "the Applicant seeks by this Agreement to set forth its obligation regarding the widening of the segment of State Road 16 . . . pursuant to Section 163.3180, Florida Statutes. . ."  (Ex. No. 11(I), p. 2).   The obligation "to widen" this segment of SR 16 is again referenced in section 4(d) of the Agreement, which sets forth the "Applicant shall use its Total Project Transportation Contribution" for this purpose, "in the location depicted in Exhibit 'C' attached hereto and incorporated herein by this reference ("SR 16 Improvements")."  (Ex. No. 11(I), p. 5, § 4(d)).  Likewise, section 4(g) made clear "[s]ubject to any limitations elsewhere imposed herein, the Applicant commits to fund and construct the SR 16 Improvements" to mitigate for traffic impacts, and this commitment is unaffected "by any subsequent interpretation of current regulations relating to transportation concurrency mitigation without the express agreement of the County, in its sole discretion."  (Ex. No. 11(I), p. 9, § 4(g)).

Significantly, the Agreement established that SEDP's construction obligation

7

was not limited by any particular dollar amount, but that it "*shall pay all costs* for the SR 16 Improvements." (Ex. No. 11(I), p. 8, § 4(e)(vi) (emphasis added)).[2]  The Agreement specifically defined the term "Total Project Transportation Contribution" as the sum of the proportionate share amount ($10,132,643) and the public benefit contribution ($4,867,357), equaling $15 million.  Other than serving as shorthand for that amount and specifying that SEDP was to use it for the SR 16 Improvements, the Agreement contained no operative language that the Total Project Transportation Contribution was the limit of SEDP's obligations for the SR 16 Improvements.  (Ex. No. 11(I), pp. 4–5, § 4(a)-(c)).  In fact, a preliminary estimate, totaling $15,013,392.49, was included in the Agreement and exceeded the $15 million "Total Project Transportation Contribution."  That estimate, included as Exhibit C to the Agreement, was prepared by Chindalur as a "best guesstimate", as the road design was not complete and was subject to additional costs.  (Ex. No. 11(I), p. 5, § 4(d); Ex. No. 10-Chindalur Tr. 93:10–98:13, (ex. 20)).  That estimate was prepared to address the County's concerns whether the construction of the SR 16 Improvements could be performed for $15,000,000, as SEDP suggested.  (Ex. No.

---

[2] The full text of this section reads:

> Applicant understands that the Escrow Funds shall not be sufficient to pay the Estimated Total Cost of the SR 16 Improvements and Applicant agrees *that it shall pay all costs* for the SR 16 Improvements which are in excess of the Escrow Funds.

6-Nguyen Tr., 98:11–107:23).   While the estimate is incorporated into the Agreement, the parties included no language in the Agreement that describes the estimate, expressly or impliedly, as a cap on SEDP's financial contribution or that would restrict SEDP's construction obligation to only the line items within the preliminary estimate.  (See Ex. No. 11(I)).

The Agreement required SEDP to complete various benchmarks in the design and construction of the SR 16 Improvements concurrent with the traffic impacts of the Grand Oaks PUD, including specific timeframes and triggers for commencement and completion of design and pond acquisitions, permitting, and commencement and completion of construction timed to the stages of the development.  (Ex. No. 11(I), pp. 5–8, § 4(e)).  SEDP, its successors, and assigns, were also responsible for "Per Unit Payments" to the County to allow for the partial accumulation of funds to be used toward construction of the SR 16 Improvements.  These payments included $7,500 per residential unit for the first 212 units, and $15,000 per unit starting with the 213th unit.  (Ex. No. 11(I), p. 7, § 4(e)(iv)).  Under the Agreement, the County "will hold the aggregate Per Unit Payments (the 'Escrow Funds') in a separate escrow account (the 'Escrow Account') to be used only for the SR 16 Improvements."  (Id.).  The Agreement does not otherwise define the term "Escrow Account" or specify requirements for the account beyond that it is "separate."

As required under section 163.31801, Florida Statutes, and the LDC, the

9

Concurrency Agreement provides that road impact fee credits are to be granted when SEDP incurs (1) Pre-Construction Costs, Permit Costs, or Construction Costs, and (2) for Per Unit Payments as and when paid to the Escrow Account on a dollar-for-dollar basis.  (Ex. No. 11(I), p. 9, § 5).  The Agreement also provides that the County will adopt SEDP's SR 16 Improvements into the County's Five-Year Schedule of Capital Improvements in the County's Capital Improvements Element ("CIE") of its Comprehensive Plan at the next scheduled update.  (Ex. No. 11(I), p. 11, § 6(c)). The County has not updated its Five-Year Schedule of Capital Improvements subsequent to the approval of the Agreement.  (Ex. No. 7-Valliere Tr. 124:15–126:3).  Finally, section 11 of the Agreement, entitled "Remedies", did not contain any notice requirements prior to declaring a default nor did it require providing any "cure" period.  This section contained a number of options available to the County should Plaintiffs fail to meet their obligations, including halting approval of additional plats or construction plans, and any Per Unit Payments becoming non-refundable.  (Ex. No. 11(I), pp.14–15, § 11).

**D. Assignment of Development Rights to SELV.**

Effective October 1, 2018, SEDP executed an Assignment of Development Rights for the Property to SELV, including "all site improvement construction plans and engineering drawings together with all other planned unit development rights, entitlements and concurrency and impact fee agreements pertaining to or benefiting

10

the Property issued by St. Johns County, Florida. . . ."  (Ex. No. 11(K); Ex. No. 3-Hyatt Tr. 135:13–139:12).  Keith Hyatt and Marc Harris are the sole members of both SEDP and SELV.  (Ex. No. 3-Hyatt 11:18–12:10; 16:15–18:2).  Following the assignment, neither SEDP nor Day Late held any development rights in the Property. (Ex. No. 3-Hyatt Tr. 25:18–32:20; 34:12–35:13).  Further, SEDP owns no real property within the Grand Oaks PUD other than a pond site, and SELV does not own any property.  (Ex. No. 3-Hyatt Tr. 15:16–25, 19:4–10).

**E. Failure to Challenge County's 2018 Actions.**

SEDP, SELV, and Day Late did not challenge any of the actions of the County at the time of approval.  Under the provisions of Article XI, Part 11.06.00 of the County's LDC, an applicant or "adversely affected person" may file an appeal to the BOCC concerning issues related to the issuance of a Final Certificate of Concurrency or where the criteria for evaluating the impact of the proposed project was incorrectly applied.  (Ex. No. 16-Art. XI, Concurrency Management, LDC, § 11.06.02).  Additionally, section 11.06.06 of the LDC creates a review process by the BOCC for any claim that a Final Certificate of Concurrency denial or a conditional approval would result in a taking of private property without lawful compensation.  (Ex. No. 16-Article 11, Concurrency Management, LDC).  The County's Growth Management Department issued a Final Certificate of Concurrency on March 18, 2019, which specifically set forth the right to appeal

11

under the LDC.  (Ex. No. 11(L)).  Neither Day Late, nor representatives of SELV and SEDP objected to the proportionate share amount or the public benefit contribution.  (Ex. No. 3-Hyatt Tr. 95:10–97:14).  No appeal was filed to the BOCC. (Ex. No. 4-Harris Tr. 48:16–50:9; Ex. No. 3-Hyatt Tr. 73:2–77:3, (ex. 11)).

### F.  Per Unit Payments and Escrow Account.

Neither SEDP, SELV, nor Day Late have paid any of the Per Unit Payments. (Ex. No. 3-Hyatt Tr. 95:10–97:14; Ex. No. 4-Harris Tr. 58:16–61:7; 62:16–63:7). Rather, according to the structure of their transactions, the payments are made to the County by homebuilders who acquire property within the Grand Oaks PUD to construct homes, including Pulte Homes, Toll Brothers, and Drees Homes.  (Ex. No. 3-Hyatt Tr. 95:10–97:14; Ex. No. 4-Harris Tr. 58:16–61:7).  The Per Unit Payments have always been held within a separate balance sheet liability account (created to implement the provisions of the Agreement) established within the Transportation Trust Fund, as required by Florida law.[3]  (Ex. No. 14-Dunn Tr. 18:5–20:7; Ex. No. 12-Schroeder Tr. 19:22–20:22; 24:22–28:4; 29:18–31:17).  The separate account was set up by the St. Johns County Clerk of Court, a separate constitutional officer, as account number "20502016" and was given the name "DUE TO DEV GRAND OAKS PUD," and restricted in that the monies held are to be paid back to the

---

[3] The Transportation Trust Fund is a statutorily required fund of the County in which all transportation revenues and expenditures are to be maintained.  § 336.022, Fla. Stat.

developer of Grand Oaks.  (Ex. No. 12-Schroeder Tr. 19:22–20:22; 24:22–28:4; 45:4–46:11, (ex. 3); 55:18–58:21; 60:13–61:24; 100:18–101:20).  No funds other than the Per Unit Payments reside in the account.  (Ex. No. 12-Schroeder Tr. 55:18–58:21).  This account is not a separate bank account but is a separate account within the fund accounting system which local governments must utilize.  (Ex. No. 12-Schroeder Tr. 85:1–85:24; 102:14–104:8).  In May 2023, the Clerk, who is solely responsible for setting up any bank accounts, independently elected to establish a separate bank account with Bank of America and moved the Per Unit Payments into it.  (Ex. No. 12-Schroeder Tr. 15:19–16:25; 19:22–20:22; 98:24–100:6, (ex. 55)).  The funds are still contained in the 20502016 balance sheet account within the Transportation Trust Fund, and are all currently accounted for.  (Ex. No. 12-Schroeder Tr. 101:2–102:10).

In May 2022, Pulte Homes delivered a check for $2,415,000 as a Per Unit Payment.  That check was misplaced and never deposited in the Clerk's account.  Upon discovering in February 2023 that the check had not been deposited, a replacement check was obtained from Pulte Homes and was deposited into the 20502016 account in March 2023.  (Ex. No. 13-Hyatt Tr. 39:8–40:15; 57:13–59:8).  There is no dispute that the $5,040,000 presently held in the 20502016 account and in the Clerk's separate bank account is the total amount that should have been collected pursuant to the Per Unit Payments. (Ex. No. 12-Schroeder Tr. 98:24–

100:6; 100:18–102:10, (ex. 55); Ex. No. 13-Hyatt Tr. 39:8–40:15).

### G. Plaintiffs' Failure to Design or Construct the SR 16 Improvements.

Under the Concurrency Agreement, SEDP and SELV did not meet several of the benchmarks established in the Agreement for design and construction of the SR 16 Improvements. The Agreement required that by the end of the "Design Period"—defined as the *earlier* of fourteen (14) months from the Effective Date of the Agreement (*i.e.*, November 21, 2019) or the Board's approval of a plat containing the project's 443rd residential unit—SEDP and SELV must have acquired all ponds necessary for the SR 16 Improvements and completed the road design. (Ex. No. 11(I), p. 6, § 4(e)(ii)). SEDP and SELV failed to comply with the benchmark of completing the pond acquisitions and road design prior to fourteen (14) months from the Effective Date, the earlier of the two dates. (Ex. No. 3-Hyatt Tr. 82:23–86:21; 86:22–88:24; 123:1–128:15; 128:16–130:25; 148:22–149:12; Ex. No. 4-Harris Tr. 53:14–55:24; 81:8–83:21; 84:6–85:18; Ex. No. 9-Schaefer Tr. 47:3–53:14, 83:17–88:13; Ex. No. 6-Nguyen Tr. 124:2–125:12; Ex. No. 2-D'Souza Tr. 7:23–10:7; 99:22–100:24). To date, SEDP and SELV have never completed the full design or acquired all of the ponds required for construction. (Ex. No. 9-Schaefer Tr. 47:3–53:14; 83:17–88:13; 100:12–102:11, (ex. 49)).

Additionally, the Agreement required SEDP and SELV to apply for all permits and other required governmental approvals within thirty days following the

end of the Design Period (no later than December 21, 2019).  (Ex. No. 11(I), p. 6, § 4(e)(iii)).  Further, all such permits and approvals were required to be obtained within one year of the end of the Design Period (no later than November 21, 2020). (Id.).  SEDP and SELV did not comply with either benchmark and did not obtain the required approvals.  (Ex. No. 3-Hyatt Tr. 92:23–94:8; Ex. No. 4-Harris 56:1–58:15; Ex. No. 9-Schaefer Tr. 83:17–85:4).

During the development of the Grand Oaks PUD, various plats were approved for development.  To date, the County has approved plats containing 442 residential units.  (Ex. No. 5-Trantham Tr. 46:22–46:3; 63:20–24).  Applications for plats for additional residential units have been submitted, which if approved, would exceed a total of 581 residential units.  The requested plats in excess of 442 remain pending and have not been approved, as SEDP had not satisfied the various benchmarks necessary for the approval of those plats. (Ex. No. 5-Trantham Tr. 45:5–46:3; 63:20–64:9; Ex. No. 7-Valliere Tr. 147:4–24; Ex. No. 11(F)).

**H. BOCC Rejection of Proposed Amendment and Finding of Default.**

At least as early as 2021, but after failing to comply with the above deadlines in the Agreement, SEDP began seeking to amend the Agreement.  It proposed various terms over several months.  (Ex. No. 2-D'Souza Tr. 45:24–49:11; Ex. No. 7-Valliere Tr. 58:1–63:11).  As part of its effort, SEDP encouraged the County to propose a letter of intent to FDOT in which the County would express a willingness

15

to provide FDOT up to $15,000,000 for the design of the SR 16 Improvements. (Ex. No. 3-Hyatt Tr. 155:19–162:5, (ex. 38, 39); Ex. No. 4-Harris Tr. 109:23–110:1). SEDP ultimately intended to seek an amendment that FDOT would have the responsibility for the design and construction of the SR 16 Improvement. (Id.). SEDP's proposed modification of the Agreement would have allowed it to obtain additional plat approvals and would provide only $15,000,000 toward the construction of the SR 16 Improvements by FDOT. (Ex. No. 7-Valliere Tr. 40:8–46:15). The BOCC authorized its Chair to send a letter to James Knight of FDOT. (Ex. No. 2-D'Souza Tr. 74:20–81:25, (ex. 1); Ex. No. 3-Hyatt Tr. 155:15–158:29, (ex. 39, 40)). The purpose of the letter, dated August 2, 2022, was to determine whether this money would facilitate design by FDOT, which SEDP had already halted, and whether it would encourage the State of Florida to provide additional funding to expedite the construction of the SR 16 Improvements. (Ex. No. 6-Nguyen Tr. 163:10–165:8, (ex. 29); Ex. No. 3-Hyatt Tr. 160:1–161:17).

On October 17, 2022, Mr. Knight with FDOT sent a letter to the Chairman of the BOCC indicating that FDOT had programmed an amount of $13,000,000[4] toward the widening of SR 16 from two to four lanes for a full 5.5-mile segment

[4] The reduction of the amount to from $15,000,000 to $13,000,000 was to provide the County with funding to assist in the cost of any utility relocation.

(which included the SR 16 Improvements), but estimated that the construction would take 20 years.  (Ex. No. 2-D'Souza Tr. 82:1–85:3, (ex. 2)).  The estimated total cost of the full 5.5-mile project was $100,000,000.  (Id.).

At SEDP's request, its proposal to amend the Agreement was heard at the February 21, 2023, BOCC meeting.  Through its representative, SEDP sought to amend the Agreement to replace its obligations to design and construct the SR 16 Improvements with an obligation to contribute a specific dollar amount in exchange for removing all development platting benchmarks.  (Ex. Nos. 11(F), 11(G), 11(H)).  In a presentation to the County, SEDP provided its view that without the amendment the Agreement "cannot be implemented" and the County "must seek an alternative funding source." (Ex. No. 11(H)).  After consideration of SEDP's request to modify the Agreement, the BOCC denied the request to amend the Agreement.  The BOCC further found that SEDP was in default, as SEDP had failed to comply with the contractual benchmarks required under the Agreement.  (Ex. No.  11(J), pp. 6–7).

Based on that determination, the BOCC directed that the money, which had been received as Per Unit Payments and was now non-refundable to the County per section 11 of the Agreement, be provided to FDOT to allow the agency to begin work on design of the SR 16 Improvements.  (Ex. No. 11(J)).  As a result of this litigation, FDOT requested that the County's initial contribution toward the design of SR 16 Improvements be from revenues other than the Per Unit Payments.  (Ex.

17

No. 7-Valliere Tr. 263:17–265:5).   The County subsequently agreed to advance funds to FDOT from other sources, subject to being repaid from the Per Unit Payments at the end of this litigation.  (Id.).  A Local Funding Agreement ("LFA") between the County and FDOT was prepared for $5,040,000 and approved at a May 2023 meeting of the Board.  (Ex. No. 7-Valliere Tr. 40:4–45:7, (ex. 121)).  As of the date of this filing, the Per Unit Payments in the amount of $5,040,000 continue to be in the possession of the County within the 20502016 account and in the Clerk's separate bank account.  (Ex. No. 12-Schroeder Tr. 98:24–100:6, (ex. 55); Ex. No. 3-Hyatt Tr. 39:8–40:15).

### III.   MEMORANDUM OF LAW

**A. Legal Standard.**

A motion for summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "The moving party bears the initial burden of proving the absence of a genuine issue of material fact."  Whitehead v. BBVA Compass Bank, 979 F. 3d 1327, 1328 (11th Cir. 2020).  Assuming the movant has carried its burden and adequately supported its motion, the burden then shifts to the nonmoving party "to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing

18

that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324, (*quoting* Fed. R. Civ. P. 56(e)).

## B. The Concurrency Agreement Requires Plaintiffs[5] to Design and Construct the SR 16 Improvements.

Although this case contains a variety of claims and defenses, the threshold issue can be stated simply: whether SEDP has a contractual obligation to construct the SR 16 Improvements under the terms of the Concurrency Agreement even where the costs of design and construction exceed $15,000,000. Florida law applies to the interpretation of the Agreement. Under Florida law, contract interpretation always begins with a review of the plain language, which is the "best evidence of the parties' intent…." <u>Taylor v. Taylor</u>, 1 So. 3d 348, 350 (Fla. 1st DCA 2009) (per curiam); <u>Sugar Cane Growers Coop., Inc. v. Pinnock</u>, 735 So. 2d 530 (Fla. 4th DCA 1999). Courts will interpret words and phrases "in their ordinary sense" and will not apply "a strained, forced, or unrealistic construction." <u>Siegle v. Progressive Consumers Ins. Co.</u>, 819 So. 2d 732, 736 (Fla. 2002) (internal citation omitted). The legal effect of the provisions of a contract should be determined from the words of the entire contract, and it is error for a court to construe a contract in a manner which leaves out words and phrases. <u>Sugar Cane Growers</u>, 735 So. 2d at 535. It is never the role

---

[5] Although SEDP was the party to the Agreement, the Plaintiffs, SEDP and SELV, are referred to throughout the argument section based on the assignment of development rights to SELV, as set forth in the Statement of Undisputed Facts. Because of the assignment, this Court should dispose of SELV's First and Second Affirmative Defenses.

of a trial court to rewrite a contract to make it more reasonable for one of the parties. Ferreira v. Home Depot, 12 So. 3d 866 (Fla. 1st DCA 2009); see also City of Pompano Beach v. Beatty, 222 So. 3d 598, 600 (Fla. 4th DCA 2017).

In reading the provisions of the Agreement as a cohesive whole, the Agreement unambiguously requires SEDP to construct the SR 16 Improvements, without a cost limitation.  The Agreement is an express reflection of SEDP's intent to fulfill its obligations to mitigate for the transportation impacts of the Grand Oaks PUD under the requirements of section 163.3180, Florida Statutes, by "*widening of the segment* of State Road 16. . .."  (Ex. No. 11(I), p. 2, § 4(d)).  This included a specific schedule and terms for SEDP to meet construction obligations, including design, acquisition of stormwater ponds, permitting, and construction, and the payment of funds into an escrow account to be used for later construction.  (Id.). The schedule and terms would have been superfluous if SEDP could simply have paid $15,000,000 and developed the Grand Oaks PUD without limit.

The parties also agreed that SEDP would use its "Total Project Transportation Contribution," equaling $15,000,000, toward the SR 16 Improvements.  However, SEDP's agreement to design and construct the SR 16 Improvements was not limited to this amount.  This is clear in the Agreement itself, which provided a preliminary engineering cost estimate for the design permitting and construction of the SR 16 Improvements that exceeded the $15 million Total Project Transportation

Contribution ($15,013,392.49). Instead, the Agreement recognized that SEDP was agreeing to pay "all costs" for the SR 16 Improvements. (Ex. No. 11(I), § 4(e)(vi)).

Significantly, SEDP accepted the obligations, specific terms, and schedule for construction without any contingency set forth that would require the costs of construction be limited to the "Total Project Transportation Contribution" of $15,000,000. Similarly, there is no limiting language in the Agreement that would cap SEDP's obligation at the amount of the preliminary cost estimate in Exhibit C to the Agreement. In fact, the estimate includes the notation that the estimated costs were based on a preliminary design and "may vary with actual design and the cost of material at the time of construction." (Ex. No. 11(I) (ex. C)). Instead, it was specifically contemplated that monies paid by SEDP, either outright or to the County as Per Unit Payments, were "credited towards" or would "count toward"[6] the Total Project Transportation Contribution but would be held for use in constructing the SR 16 Improvements. (Ex. No. 11(I), p. 7, § 4(e)(iv)). While Per Unit Payments would stop once total payments reached the Total Project Transportation Contribution or construction commenced, SEDP would still be required to meet the design, permitting, and construction requirements of the Agreement, even if the amount in

---

[6] For example, the Permit Costs "shall be credited towards" the Total Project Transportation Contribution." (Ex. No. 11(I), pp. 6–7, § 4(e)(iii)). Each "Per Unit Payment" would "count toward the Total Project Transportation Contribution." (Ex. No. 11(I), p. 7 § 4(e)(iv)(b)).

escrow was not sufficient to cover all costs.  (Id., p. 8, § 4(e)(vi)).

Plaintiffs' shifting interpretation of the Agreement as limited to a certain dollar amount or to the line items included in the preliminary estimate is belied by both the specific language and structure of the Agreement.  Reading such limitations into the Agreement would give Plaintiffs something the parties had not intended— an option to not perform the contract if the cost exceeds the estimate—while leaving the County with all the impacts of the development and little of the stipulated mitigation or public benefit.  See City of Pompano Beach v. Beatty, 222 So. 3d 598, 600 (Fla. 4th DCA 2017).  The Agreement unambiguously requires SEDP to design and construct the SR 16 Improvements, without limiting those costs to only those estimated at the time of the Agreement.

In the alternative, even if the Court disagrees and determines as a matter of law that the Agreement is ambiguous as to SEDP's obligations to the design and construct the SR 16 Improvements, and considers parol evidence[7], SEDP's own

---

[7] The interpretation of a contract, including whether it is ambiguous, is a question of law.  Caracol TV S.A. v. Telemundo TV Studios, 2022 U.S. App. LEXIS 2050 (11th Cir. 2022).  "Before extrinsic matters may be considered by a court in interpreting a contract, the words used on the face of the contract must be ambiguous or unclear." Acceleration Nat'l Serv. Corp. v. Brickell Fin. Servs. Motor Club, Inc., 541 So. 2d 738, 739 (Fla. 3d DCA 1989) (per curiam).  A contract is "ambiguous" only when it is of "uncertain meaning and may be fairly understood in more ways than one." Emergency Assocs. of Tampa, P.A. v. Sassano, 664 So. 2d 1000, 1002 (Fla. 2d DCA 1995).  "In the event of such an ambiguity, a trial court is authorized to admit parol evidence to explain the words used and how the contracting parties intended them to be interpreted." Id. (citation omitted). However, in the absence of such ambiguity, parol evidence is inappropriate. See Fla. Bar v. Frederick, 756 So. 2d 79 (Fla. 2000).

application proposed the widening of SR 16 as mitigation, and SEDP's legal counsel during a public meeting clearly stated, without any disagreement from Plaintiffs, that any risk of cost increase was *"the developer's risk*."  (Ex. No. 15-TR. 31:22–33:2 (emphasis added); Ex. No. 3-Hyatt Tr. 122:15–25).  This discussion is confirmed by the meeting minutes.  (Ex. No. 11(E), p. 21, at 11:25 a.m.).  In addition, the County's Growth Management report also recognized the Agreement provided for construction "regardless of costs," and Counsel for SEDP did not raise any issue with the report.  (Ex. No. 11(C); Ex. No. 8-Avery-Smith Tr. 106:5–108:1).  The interpretation that Plaintiffs now seek from the Court is directly counter to the interpretation and bargain of the parties at the time of the agreement.

### C. Plaintiffs Are Barred from Challenging the Validity of the County's Proportionate Fair Share Program, the Proportionate Share Calculation, or the Agreement.

1. The Amended Complaint Challenges Only the County's 2023 "Interpretation" of the Concurrency Agreement, Not the Validity of the County's Proportionate Fair Share Program or the Agreement.

The Court should not consider any argument by Plaintiffs that either the Agreement or the County's Proportionate Fair Share Program that led to it are not valid, enforceable, or constitutional as written.  Count I of Plaintiffs' operative Amended Complaint does not seek to invalidate the County's Proportionate Fair Share Program as codified in Article XI of its LDC, or the Agreement itself, but seeks a declaration only that the County's 2023 "interpretation" of the Agreement is

23

invalid, illegal, and unconstitutional.  SEDP's original Complaint for Declaratory, Injunctive and Other Relief, filed in state court on March 14, 2023, did include Counts I–III for declarations that both the Proportionate Fair Share Program and the Agreement were invalid, illegal, and unconstitutional, and sought injunctive relief. (Doc. 1-4, pp. 13–17).  The County's Answer and Affirmative Defenses asserted these claims were barred by the statute of limitations, among other affirmative defenses.  (Doc. 16).  Instead of pursuing these claims, including the claim of invalidity of the Proportionate Fair Share Program—which was clearly untimely under section 95.11, Florida Statutes[8]—the Amended Complaint specifically drops the original Counts I–III of the state court complaint and does not argue under Count I that the Concurrency Agreement itself or the County's Proportionate Fair Share Program are invalid, illegal, or unconstitutional.  Therefore, these issues are not before this Court.  The only issues before the Court are related to the County's actions in enforcing its contractual rights in 2023—not the validity, legality, or constitutionality of the Agreement or the Proportionate Fair Share Program.  As set forth above, the current "interpretation" of the County is based on a plain reading of

---

[8] Declaratory judgment actions are subject to a four-year statute of limitations.  § 95.11(3)(o), Fla. Stat.; Manatee Cnty. v. Mandarin Dev., Inc., 301 So. 3d 372 (Fla. 2d DCA 2020) (citing former statutory provision (§ 95.11(3)(p), Fla. Stat.) and noting that a declaratory judgment action is subject to a four-year statute of limitations because it is a cause of action not otherwise specifically listed in section 95.11, Florida Statutes.).

the Agreement itself, which is also supported by the parties' reading of the Agreement at the time it was signed.

2. Plaintiffs Failed to Timely Pursue Their Administrative Remedies to Challenge the Concurrency Agreement and its Underlying Proportionate Fair Share Obligation (County's Fourth Affirmative Defense).

In addition to being untimely, any claims by Plaintiffs that the County's Concurrency Agreement or its calculation of SEDP's proportionate fair share were invalid are barred for the additional reason that Plaintiffs failed to timely pursue available administrative remedies.  A party must exhaust its administrative remedies before challenging a county's interpretation of its land development code, or a land use ruling, including as to determinations under concurrency requirements.  See Clay v. Monroe Cnty., 849 So. 2d 363 (Fla. 3d DCA 2003); see also Braden Woods Homeowners Ass'n v. Mavard Trading, Ltd., 277 So. 3d 664 (Fla. 2d DCA 2019); Vanderbilt Shores Condo. Ass'n v. Collier Cnty., 891 So. 2d 583 (Fla. 2d DCA 2004).  The doctrine of exhaustion applies to local governments no less than it applies to agencies of the state.  Palm Lake Partners, II, LLC v. C&C Powerline, Inc., 38 So. 3d 844 (Fla. 1st DCA 2010).  Florida courts have applied the exhaustion requirement to land use claims where such would not be deemed "futile."  New Testament Baptist Church, Inc. v. State, 993 So. 2d 112 (Fla. 4th DCA 2008).

In 2018, the BOCC considered SEDP's application for the Plan Amendment,

PUD Rezoning, and the Concurrency Agreement, which were all approved on July 17, 2018.  At the time of the approval, neither SEDP nor Day Late objected to the provisions of the Agreement.  Nor did SEDP or Day Late seek an appeal of the Final Certificate of Concurrency to the BOCC, as allowed by the County's LDC, to challenge the proportionate fair share calculation or the public benefit contribution. (Ex. No. 3-Hyatt Tr. 73:2–77:3; Ex. No. 4-Harris Tr. 48:16–50:9).  To the contrary, SEDP's attorney drafted the Agreement in which the parties expressly agreed to the proportionate share calculation and the proposed mitigation.  (Ex. No. 8-Avery-Smith Tr. 46:20–24, 75:6–80:25, (ex. 10–14)).  Plaintiffs have not alleged and cannot show that such efforts would have been futile in 2018.  As such, Plaintiffs cannot now claim that the Agreement, nor the calculation of its proportionate fair share are invalid or were incorrect in application.

3.  <u>SEDP Accepted the Benefits of the Agreement, and its Claims are Barred by Principles of Laches, Waiver, Estoppel, and/or Unjust Enrichment (County's First, Second, Third, and Sixth Affirmative Defenses)[9].</u>

The essential elements of estoppel are (1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon.  <u>Lloyds Underwriters at London v. Keystone</u>

---

[9] These arguments apply equally to Counts I, II, and IV of Plaintiffs' Amended Complaint.

Equip. Fin. Corp., 25 So. 3d 89 (Fla. 4th DCA 2009). "The 'representation' upon which an estoppel may be predicated may consist of words, conduct, or if there is a duty to speak, silence." Id. "Based on equitable principles, once a party accepts the proceeds and benefits of a contract, that party is estopped from renouncing the burdens the contract places on him." Fineberg v. Kline, 542 So. 2d 1002 (Fla. 3d DCA 1988). "One who accepts the benefits of a contract cannot, having retained these benefits, question the validity of the contract." Billings v. Orlando, 287 So. 2d 316 (Fla. 1973) (former police officers of the City estopped from arguing that certain provisions of a contract were unconstitutional where the officers accepted the benefits of the same contract); see also Spurrier v. United Bank, 359 So. 2d 908, 910 (Fla. 1st DCA 1978) (stating "one may not accept the fruits of a contract and at the same time, renounce, or repudiate, the burdens which that contract places on him").

Although closely related, waiver is distinct from the concept of estoppel and is the "intentional relinquishment of a known right." Arbogast v. Bryan, 393 So. 2d 606 (Fla. 4th DCA 1981). It can be express or implied. Id. Waiver depends on establishing the existence of a right, privilege, advantage, or benefit which may be waived; the actual or constructive knowledge thereof; and an intention to relinquish such right, privilege, advantage, or benefit. Id. Waiver may be inferred from conduct or acts putting one off his guard and leading him to believe that a right has been waived. Id.

27

Florida courts have previously recognized that the concepts of waiver and estoppel may be applied in circumstances similar to those here.  Sarasota Cnty. v. Taylor Woodrow Homes, 652 So. 2d 1247, 1252 (Fla. 2d DCA 1995) (recognizing Sarasota County would have a right to raise such defenses where a developer failed to challenge a required dedication until years after entering into the contract, and where the citizens of the county may have acted to their detriment in reliance on the validity of the contract); see also New Testament Baptist Church, 993 So. 2d 112 (Fla. 4th DCA 2008) (determining that a church had ratified an earlier plat dedication upon conveying the property when it did not object or challenge the dedication at the time via available administrative and judicial remedies and accepted the benefits of the dedication).

At the time of the approval of the Plan Amendment, the PUD Rezoning, and the Agreement, neither Day Late, SEDP, nor SELV objected to the proportionate share amount, the public benefit contribution, nor the Per Unit Payment set forth in the Agreement, and none challenged the validity of the same.   Instead, they specifically recognized the obligation for construction was at "the developer's risk."

Since receiving these approvals in 2018, Plaintiffs have been allowed to move forward with the development of Grand Oaks.  Currently, substantial infrastructure and residential lots have been built.  (Ex. No. 11(H), pp. 7–10).   In total, 442 residential units have been platted since approval, which the County has allowed to

28

move forward based on the transportation mitigation agreed to in the Agreement. The County has also awarded impact credits to Plaintiffs for the value of the Per Unit Payments, in accordance with the Agreement.  (Ex. No. 7-Valliere Tr. 27:16–25, 146:10-17).  Clearly, Plaintiffs accepted and received benefits from entering into the Agreement.  It was the applicant's choice to demonstrate a public benefit for purposes of the Plan Amendment through the contribution of the SR 16 Improvements.  No specific form of public benefit was required.  Plaintiffs are estopped and have waived any ability to disclaim their obligations under the Agreement.  The County and the public detrimentally relied on the obligations of Plaintiffs at the time the Agreement was adopted and have allowed substantial development to proceed.  Allowing Plaintiffs to now assert they are not responsible for compliance with the proportionate share benefits or the obligation to construct the SR Improvements would result in an unjust enrichment to Plaintiffs.

### D. The County Did Not Materially Breach the Concurrency Agreement.[10]

To prevail on a cause of action for breach of contract, evidence must be presented that establishes: (1) a valid contract; (2) a material breach of the contract; and (3) damages.  Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker, 160 So. 3d 955 (Fla. 5th DCA 2015).  "To constitute a vital or material breach a

---

[10] These issues also dispose of SEDP's First and Tenth Affirmative Defenses, and SELV's Ninth and Twelfth Affirmative Defenses.

29

defendant's nonperformance must be such as to go to the essence of the contract; it must be the type of breach that would discharge the injured party from further contractual duty on his part." Beefy Trail, Inc. v. Beefy King Intern., Inc., 267 So. 2d 853, 857 (Fla. 4th DCA 1972).

     1.  Requirement for Adoption of SR 16 Improvements into Five-Year Schedule of Capital Improvements in the Capital Improvements Element of the Comprehensive Plan.

Plaintiffs allege the County breached the Concurrency Agreement by failing to include the SR 16 Improvements in the Five-Year Schedule of Capital Improvements at the next scheduled update. Because the County has not updated its Capital Improvement Element since approval of the Agreement, this requirement has not yet been triggered. (Ex. No. 7-Valliere Tr. 124:15–126:3). Even if the requirement had been triggered, no evidence has been presented that would suggest that failure to include the improvements (which were SEDP's obligations, not the County's) in the schedule would go to the "essence" of the contract and discharge SEDP from further contractual duty. Beefy Trail, 267 So. 2d at 857; Covelli Family, L.P. v. ABG5, L.L.C., 977 So. 2d 749 (Fla. 4th DCA 2008). "[T]rivial noncompliance and minor failings do not constitute material breaches." Burlington, 160 So. 3d at 960.

     2.  Accounting for and Maintaining Per Unit Payments Under a Separate Escrow Account.

30

Plaintiffs allege that the County has failed to properly account for the Per Unit Payments or maintain a separate escrow account under the Agreement. The County is required to "hold the aggregate Per Unit Payments (the 'Escrow Funds') in a separate escrow account (the 'Escrow Account') to be used only for the SR 16 Improvements." (Ex. No. 11(I), p. 7, § 4(e)(iv)(b)). However, nothing in the Agreement defines or describes the "Escrow Account" other than that it must be "separate." The Agreement specifies only when SEDP may apply for release of the funds, and the use of those funds for payment of construction costs for the SR 16 Improvements. It is undisputed that the County has held the Per Unit Payments in a separate account as part of the required fund accounting system, and their use was restricted. Having never objected to this arrangement at any time in the years since execution of the Agreement, Plaintiffs now challenge that the County did not meet its obligation by holding the funds in a separate *bank* account until May 2023. However, the requirements of the Agreement must be understood against the backdrop of the legal requirements for County finance and accounting, as well as the parties' course of dealing for the years before litigation. Wilcox v. Atkins, 213 So. 2d 879, 881 (Fla. 2d DCA 1968) (providing that in construing words and phrases used in a contract, when words having a definite legal meaning and effect are used, "the parties thereto will be presumed to have intended such words or terms to have their proper legal meaning and effect, in the absence of any contrary intention

31

appearing in the instrument").

Deposits held by the St. Johns County Clerk, a separate constitutional officer[11], on behalf of the County are already subject to controls not applicable to private parties.  Florida law forbids the clerk, "acting as county auditor," from signing illegal warrants and provides both personal and criminal liability for violations of this provision.  § 129.09, Fla. Stat.; <u>Alachua Cnty. v. Powers</u>, 351 So. 2d 32, 36 (Fla. 1977).

In addition, the Transportation Trust Fund under which the Per Unit Payments are placed is subject to specific limitations.  Governmental accounting is organized and operated on a fund basis, and each fund contains separate accounts.  <u>See</u> § 218.33, Fla. Stat.; Ex. No. 18-Fla. Admin. Code Rule 69I-51.0012 (adopting the "Uniform Accounting System Manual, 2014 Edition").[12]  Pursuant to general law, the County must keep the transportation trust fund as a separate budgetary fund for all transportation-related revenues and expenses.  §§ 129.011, 336.022, Fla. Stat.  Under section 336.022, Florida Statutes, "*[a]ll funds* received by a county for

---

[11] The Florida Constitution establishes the clerk of the circuit court as a separate constitutional officer, who serves in dual roles as both clerk of court and as "ex officio clerk of the board of county commissioners, auditor, recorder, and custodian of all county funds" unless otherwise provided by county charter or special law approved by vote of the electors.  Art. V, § 16, Art. VIII, § 1(d), Fla. Const.  The clerk, as the accountant for the board of county commissioners, shall keep the accounts and books of accounts for the County.  §§ 28.12, 116.07, 125.17, Fla. Stat.

[12] A Motion for Judicial Notice of the Rule and Manual has been separately filed.

32

transportation shall be deposited into this fund.  No expenditures other than transportation expenditures authorized by law shall be made from such fund." § 336.022(1), Fla. Stat. (emphasis added).  Thus, any funds received by the County for transportation, including the Per Unit Payments received under the Agreement, must by law be deposited into this fund.

Under the required fund accounting system, "[s]eparate bank accounts are not necessary for funds."  (Ex. No. 18-Uniform Accounting System Manual, 2014 ed., p. 5).  Instead, "[c]entralized bank accounts which are reconciled to separate cash statements for each fund will maintain cash control over each fund."  Id.  As part of the uniform accounting system, balance sheet accounts are established for liabilities or accounts payable, including a "contracts payable" which can be established for "amounts due on contracts for assets, goods and services received by a reporting entity," and is given the first three numbers of "205."  (Ex. No. 18-Uniform Accounting System Manual, 2014 ed. pp. 10, 18).[13]

The Per Unit Payments have always been and remain accounted for in the same accounts payable account first established under the Transportation Trust Fund

---

[13] This understanding of "account," as separately accounting for and controlling the funds, as opposed to a separate bank account, is also supported by a plain reading of the term.  Under the first dictionary definition of "account" it is a "record of debit and credit entries to cover transactions involving a particular item or a particular person or concern."  MERRIAM-WEBSTER DICTIONARY, www.merriam-webster.com/dictionary/account (last visited Apr. 26, 2024).

for this purpose: under Fund 1111, and account 20502016.  (Ex. No. 12-Schroeder Tr. 85:1–24; 102:14–104:8).  It is undisputed that all monies received as Per Unit Payments are currently accounted for and contained within the balance sheet account, which the Clerk has now elected to hold in a separate bank account at the County's depository institution, Bank of America, as of May 2023.

To the extent Plaintiffs point to the misplacement of a certain check for Per Unit Payments issued by Pulte Homes as a basis for their claim on this point, the misplaced check was later resolved by the reissuance of a check from Pulte, and all funds are currently available and accounted within the proper account.  Plaintiffs cannot establish a material breach, nor that they were damaged in any way by the temporary misplacement of a check from this third party.  This issue is therefore moot (County's 13th Affirmative Defense) and, in any event, is not a material breach of the contract which would excuse Plaintiffs' performance of the contract.

3. <u>The County Cannot Be Held in Breach for Failure to Approve an Amendment to an Agreement for Which Plaintiffs Were Already in Breach/Default.</u>

Plaintiffs further allege that the County failed "to cooperate with SEDP to effectuate the terms of the Agreement."  (Doc. 5, ¶ 59(v)).  However, as will be discussed in the following sections, it is undisputed that Plaintiffs failed to complete the design and acquire all ponds by the trigger period contained in the Concurrency Agreement.  This occurred well before Plaintiffs sought to amend the Agreement.

Nor can the County's decision not to amend the Agreement be considered a breach of contract for failure to cooperate in effectuating the terms of the original agreement.[14]

### E. SEDP Materially Breached the Concurrency Agreement by Failing to Comply with the Conditions of the Agreement, and the County Properly Found SEDP in Default.

In this case, it was not the County who breached the Concurrency Agreement, but instead, SEDP by failing to comply with material obligations under the Agreement.  In particular, SEDP was required to complete the pond acquisitions and road design within the "Design Period," defined as *the earlier* of fourteen months of the effective date of the Agreement (*i.e.*, by November 21, 2019) or by the Board's approval of a plat containing the Project's 443rd residential unit, and as a condition of such approval.  (Ex. No. 11(I), p. 6, § 4(d)(ii)).  SEDP was then required to apply for and pursue all required permits and approvals within 30 days of the end of the Design Period and obtain the permits and approvals within one year of the end of the Design Period.  (Ex. No. 11(I), pp. 6–7, § 4(d)(iii)).  SEDP's principals and

---

[14] Plaintiffs have also alleged a breach of contract based on the County "erroneously finding SEDP" in default of the Agreement.  (Doc. 5, ¶ 59(iv)).  This issue is disposed of based on the discussion of SEDP's breach, as set forth in section E, that follows.  In addition, Plaintiffs are not entitled to the equitable relief that they request, as they knowingly entered into the Agreement and agreed to abide by its terms, and obtained a benefit before they reversed position as to its interpretation.  Therefore, the doctrine of unclean hands applies (County's Eighth Affirmative Defense), and Plaintiffs have not set forth an entitlement to injunctive relief (County's Eleventh Affirmative Defense).

project engineer have confirmed that SEDP did not comply with these requirements. Because of Plaintiffs' noncompliance, the County never approved the plat with the 443rd residential unit and could not approve any additional plats because Plaintiffs had failed to complete the design or pond acquisitions.  (Ex. No. 5-Trantham Tr. 45:5–46:3; 48:16–49:1).

Unlike Plaintiffs' claims regarding the Capital Improvement Schedule or the Escrow Account, this failure does go to the essence of the Agreement to provide for mitigation of the traffic impacts of the Grand Oaks PUD through SEDP's design and construction of the SR 16 Improvements.  Of course, construction cannot commence without design and permitting, and the specific timing triggers in the Agreement for design, permitting, and ultimately construction were intentionally prepared to correspond to the traffic impacts associated with the stages of the development.  (See Ex. No. 2-D'Souza Tr. 41:8–21; 149:19–150:10; Ex. No. 11(F), pp. 2–3).   The Agreement did not contain any "cure" period, and the Board had the authority to determine default had occurred under its provisions.  (Ex. No. 11(I), pp. 14–15, § 11).  Plaintiffs' failure to adhere to the schedule contemplated by the Agreement was prejudicial, as the Agreement contemplated a schedule such that the improvements would be completed within the same time parameters as the transportation impacts.  (See Ex. No. 2-D'Souza Tr. 149:19–150:10; Ex. No. 11(F), pp. 2–3).

36

**F. The County Has Authority to Enforce its Specific Contractual Remedies, or, in the Alternative, is Entitled to Specific Performance.**

Under the Agreement, the County retained all remedies available at law or in equity, including the remedies of specific performance and all forms of injunctive relief.  In addition to other remedies, the Agreement specifically provided the following: (1) that the County may halt the approval of additional plats or construction plans until and unless Plaintiffs comply with the conditions of sections 4 and 5 of the Agreement or some other entity constructs the SR 16 Improvements; (2) that the Per Unit Payments paid for units at the Property to date shall become non-refundable and shall be used by the County to construct a portion of the SR 16 Improvements or another road improvement; and (3) that Plaintiffs must assign the Road Design documents and any permits to the County, free of charge.  (Ex. No. 11(I), pp. 14–15, § 11).  As such, the County is entitled to a declaration as set forth in its Second Amended Counterclaim: that is, that the Plaintiffs/Counter-Defendants have breached the Agreement, and that the County has a right to the above-stated relief, as specifically set forth in the Agreement.  Alternatively, the County is entitled to specific performance of the Agreement based on Plaintiffs/Counter-Defendants' default.  There is nothing in the Agreement itself, or Florida law, which would limit the County's remedies solely to the Per Unit Payments collected and held by the County under the Agreement.  (SEDP's 8th and 9th Affirmative Defenses; SELV's

10th and 11th Affirmative Defenses).

### G. Plaintiffs' Affirmative Defenses of Unclean Hands, Anticipatory Repudiation, Frustration of Purpose, Estoppel, Wavier, and Impossibility Must be Rejected Because They are Based on Assumption of Facts for Which There is No Proof.

SEDP and SELV have asserted several affirmative defenses based on the fiction that the County "unlawfully found SEDP in default of the agreement, despite the knowledge that it had no legal basis to do so, and directed disbursement of over $5 million to FDOT for its use in constructing the SR 16 Improvements." (Docs. 34, 35; SEDP 2nd, 3rd, 4th, 5th, 6th, and 7th Affirmative Defenses; SELV 3rd, 4th, 5th, 6th, 7th, and 8th Affirmative Defenses). Plaintiffs have pointed to a purported July 10, 2022, discussion with FDOT (attested to only by Plaintiffs' own principals) during which they were supposedly told by FDOT to "put their pencils down" as to the design of the roadway. (Ex. No. 4-Harris Tr. 92:10–93:9, (ex. 31); Ex. No. 3-Hyatt Tr. 147:14–149:12, (ex. 31)). Assuming this discussion actually occurred, it undisputedly occurred *years after* the trigger date for completion of the pond acquisitions and road design and, therefore, after SEDP was already in breach. Further, the evidence is that, while the County has transferred some money from other sources to FDOT for design work, FDOT has made no commitment to

construct the road.[15]  (Ex. No. 2-D'Souza Tr. 56:15–18, 59:2–12, 89:3–6).  And, as discussed earlier, the County continues to hold the Per Unit Payments under the Agreement.

### H. Plaintiffs Lack Standing to Bring a Claim of Inverse Condemnation, and in Any Event, Cannot Demonstrate an Unconstitutional "Taking."

"Inverse condemnation is a cause of action by a property owner to recover the value of property that has been *de facto* taken by an agency having the power of eminent domain where no formal exercise of that power has been undertaken." Ocean Palm Golf Club P'Ship v. City of Flagler Beach, 139 So. 3d 463, 471 (Fla. 5th DCA 2014).  Inverse condemnation occurs "where a government agency, by its conduct or activities, has effectively taken private property without a formal exercise of the power of eminent domain…."  Rubano v. Dep't of Transp., 656 So. 2d 1264, 1266 (Fla. 1995).  Only the property owner at the time of the taking can suffer a compensable injury for an inverse condemnation claim.  See Simon v. Deer Meadow Homeowners' Ass'n, 277 So. 3d 197, 199 (Fla. 1st DCA 2019).

1.  Plaintiffs Lack Standing to Bring a Claim of Inverse Condemnation as to the Per Unit Payments.

Plaintiffs assert that the County's "seizure of over $5 million of funds paid by

---

[15] Plaintiffs have indicated that language in the Agreement recognizing the possibility that another entity might construction the SR 16 Improvements would allow Plaintiffs to comply with the Agreement by only paying the $15,000,000 Total Project Transportation Contribution.  While the County disputes that interpretation, it is undisputed that no entity has constructed the improvements.

SEDP (or its assigns)" as Per Unit Payments constitutes an uncompensated taking in violation of Article X, Section 6(a) the Florida Constitution.  (Doc. 5 ¶ 68).  Even if true, Plaintiffs lack standing to raise an inverse condemnation for the "seized" funds. First, neither Plaintiffs nor Day Late have paid any portion of the $5,040,000 that is the subject of Plaintiffs' inverse condemnation claim.  (Ex. No. 4-Harris Tr. 58:16–59:5; 60:17–61:7; Ex. No. 3-Hyatt Tr. 95:25–96:12).  All $5,040,000 in Per Unit Payments were paid by homebuilders within Grand Oaks who are not parties to this instant action.  (Ex. No. 13-Hyatt Tr. 85:22–86:12; Ex. No. 4-Harris Tr. 60:24–61:1; Ex. No. 1-Smith Tr. 45:5–17).  Thus, assuming without conceding that an inverse condemnation claim relating to the Per Unit Payments were available to someone, Plaintiffs would not be the proper claimants to pursue it.  Additionally, Plaintiffs have already received compensation in the form of impact fee credits for the value, on a dollar-for-dollar basis, of the Per Unit Payments paid by the third parties.  (See Ex. No. 7-Valliere Tr. 27:16–25).

Second, even if the Per Unit Payments could be deemed "seized" by the County so as to constitute a taking of personal property, any governmental act by the County occurred prior to the Plaintiffs having any ownership interest in the monies.  Under the Agreement, the Plaintiffs' interest in the Per Unit Payments was conditioned upon (1) SEDP achieving commencement of construction of the SR 16 Improvements, and (2) SEDP applying to the County for release of the Per Unit

Payments. (Ex. No. 11(I), p. 8, § 4(e)(vi)). Stated differently, unless and until SEDP

achieved commencement *and* applied for release of the funds, the ownership interest

remained with the payors, *i.e.*, the homebuilders Pulte Homes, Toll Brothers, and

Drees Homes. The Plaintiffs' interest in the monies was conditional upon SEDP's

satisfaction of those specific triggers, which did not occur. It is undisputed that

SEDP never achieved commencement of the SR 16 Improvements, nor has SEDP

ever applied to the County for release of the $5,040,000 contributed in Per Unit

Payments because it failed to achieve commencement. Since SEDP never achieved

commencement of the SR 16 Improvements or ever applied to the County for release

of the Per Unit Payments, it has no interest in the funds. Only the owner at the time

of an alleged taking has suffered an injury potentially permitting recovery. Simon,

277 So. 3d at 199 (Fla. 1st DCA 2019); accord Dep't of Transp. v. Burnette, 384 So.

2d 916, 920 (Fla. 1st DCA 1980) (in a takings case "…a right to compensation vests

in the person owning the property at the time of such interference."). As such, both

Plaintiffs lack standing to assert an inverse condemnation claim as to the $5,040,000.

    2.   No Unconstitutional Taking Has Occurred.

        i.   *The Per Unit Payments Continue to Be Held by the County in an Escrow Account.*

Plaintiffs' inverse condemnation claim also fails because the County has not

taken or appropriated any of the $5,040,000 in Per Unit Payments. As discussed

earlier, the funds were paid to the County pursuant to the terms of the Agreement and remain in the established escrow account and remain available for SEDP's use in constructing the SR 16 Improvements.  (Ex. No. 12-Schroeder Tr. 101:21–102:10).

ii.   *A Dispute Over Payments Subject to Contractual Obligations is Not a Claim for Unconstitutional Taking.*

Even if the County had not elected to keep the Per Unit Payments in the escrow account, but, instead, used them for the design and construction of the SR 16 Improvements, it would not amount to an unconstitutional taking.  Plaintiffs seek to elevate an as-yet-unexercised contractual remedy into an inverse condemnation claim.  The Agreement provides that in the event of a default by SEDP, the Per Unit Payments held by the County would become non-refundable and the County shall use the monies to construct the SR 16 Improvements or other nearby road improvements. (Ex. No. 11(I), pp. 14–15, § 11).  Though SEDP has defaulted under the Agreement, the County has not yet exercised this remedy.  If the County were to exercise this remedy and appropriate the Per Unit Payments, such action could not constitute a taking because SEDP agreed to the contractual remedy, *i.e.*, the transfer of the $5,040,000 to the possession, ownership, and control of the County.  In sum, there has been no government action that has deprived Plaintiffs of a right to the monies contributed as Per Unit Payments.

42

## I. Plaintiffs Claim for Unlawful Exaction Must Fail.

In the final count of their Amended Complaint, Plaintiffs allege that the County imposed unconstitutional conditions upon Plaintiffs as a requirement of obtaining approval to develop Day Late's real property.  (See Doc. 5, ¶ 72). Specifically, Plaintiffs allege that, as a condition of development approval, the County required SEDP to pay a total project transportation contribution amount of $15,000,000, which was comprised of $10,132,643 in proportionate share contribution and $4,867,357 in public benefit contribution.  (Id., ¶ 73).  Plaintiffs also allege that the County required SEDP to "contribute $57 million in roadway improvements" as a condition of approval.  (Id., ¶ 75).  All of these conditions constitute monetary exactions, Plaintiffs allege, because the conditions bear no essential nexus to a legitimate public purpose and are not roughly proportionate to the impacts of the Grand Oaks development.  (Id., ¶¶ 74, 76).

1. Plaintiffs Lack Standing to Challenge the Imposition of Conditions to Develop Day Late's Real Property and Fail to State a Claim.

Article III of the United States Constitution limits the judicial power of the United States to the resolution of cases of controversies.  The Supreme Court has articulated three requirements for Article III standing.  First, the plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or

hypothetical." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992) (cleaned up). Second, there must be "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Id. (cleaned up). Third, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. at 561 (cleaned up). Plaintiffs fail to satisfy the first prong because neither has suffered an injury-in-fact due to the County's purported imposition of monetary exactions.

Plaintiffs' exaction claim is based upon the Supreme Court's holding in Koontz v. St. Johns River Water Management District, 570 U.S. 595 (2013). As explained in Koontz, "the government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." Koontz, 570 U.S. at 606 (2013). If the government lacks a nexus and the demands are not in rough proportionality to the impacts, the demands are considered extortionate. Monetary exactions must satisfy the same nexus and proportionality requirements. Id. at 612. "Extortionate demands for property in the land-use permitting context run afoul of the Takings Clause not because they take property but because they impermissibly burden the right not to have property taken without just

44

compensation." Id. at 607.  An unconstitutional land-use exaction occurs when the government requires the landowner to surrender property in exchange for land-use permits.  See Nollan v. Cal. Coastal Comm'n, 483 U.S. 825 (1987); Dolan v. City of Tigard, 512 U.S. 374 (1994); Koontz, 750 U.S. 595 (2013).

The undisputed facts do not demonstrate that the County impermissibly burdened the landowner's right to use its land.  Instead, the facts show that the conditions for SEDP's Development Entitlements were adopted as to non-landowner SEDP, and its successors and assigns, after SEDP *voluntarily proposed* the specific conditions now at issue in lieu of monetary payment.  In other words, there was no "extortionate demand."  Plaintiffs cannot demonstrate an injury-in-fact—an invasion of a legally protected interest—due to the imposition of the land use conditions SEDP proposed to place upon itself.  Alternatively, to the extent the approval conditions are determined to lack a sufficient nexus or proportionality for purposes of sustaining an exaction claim, the injury lies with the landowner, Day Late, not the Plaintiffs.

As to the specific requirement to construct the SR 16 Improvements, Plaintiffs lack standing and fail to state a claim because there is no causal connection between the actions of the County and the purported increase in roadway construction costs. Plaintiffs assert that the County has now imposed a $57,000,000 exaction upon SEDP by requiring SEDP to construct a roadway that now costs more than its

preliminary estimate of approximately $15,000,000.  (See Doc. 5, ¶ 75).  Of that estimate, the parties had agreed that $10,132,643 would satisfy SEDP's proportionate share contribution, as supported by calculations from SEDP's own consultant.  The difference between that amount and the final cost of the SR 16 Improvements would function as SEDP's public benefit contribution.  In 2018, the public benefit contribution was estimated to be $4,867,357.  To the extent projected costs to construct the SR 16 Improvements have increased since 2018, any such increase is due to rise in construction costs and additional design requirements by FDOT, events outside of the County's control.[16]  And the undisputed facts do not demonstrate any causal connection between the County's actions and any injury allegedly suffered by the Plaintiffs due to an increase in costs.[17]

Finally, SEDP lacks standing because it has assigned all development rights, including planned unit development rights, entitlements, and concurrency and impact fee agreements pertaining to or benefiting Grand Oaks issued by the County to SELV.  (Doc. 5, Ex. B).  Having assigned all rights under the Agreement to SELV,

---

[16] Notably, had Plaintiffs timely met their obligations, some of the cost increases might have been avoided.

[17] Plaintiffs could have proposed to simply pay the proportionate share amount (calculated by SEDP's own engineer) and a public benefit contribution.  Indeed, they considered doing so at one point, before voluntarily proposing (and later agreeing) to construct the SR 16 Improvements in lieu of making such financial contributions.

46

SEDP now lacks standing to challenge any conditions imposed upon it to obtain those development rights.

>   2. Plaintiffs Cannot Support a Substantive Due Process Claim as They Have Not Challenged a "Legislative Act."

In Count IV, Plaintiffs specifically request the Court declare the County "violated due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution," and allege the County imposed unlawful conditions "in its legislative capacity." (Doc. 5 at 20). However, the as-applied challenge to a land use decision such as the one involved here can only be a challenge to an executive action. Under long-standing case law, executive action never gives rise to a substantive due process claim unless it infringes on a fundamental right. Hillcrest Prop., LLP v. Pasco Cnty., 915 F.3d 1292, 1293 (11th Cir. 2019) (*citing to* McKinney v. Pate, 20 F.3d 1550 (11th Cir. 1994) (en banc)). There is no denial of any fundamental right in this matter because land use rights are state created rights. Hillcrest Prop., 915 F.3d at 1302. As such, to the extent Count IV attempts to set forth a substantive due process claim, the claim must fail. Id.

>   3. Plaintiffs' Claims Are Barred by Laches, Waiver, Estoppel, Unjust Enrichment, and/or for Failure to Exhaust Remedies.

The County adopts its arguments from sections III.C.(ii)-(iii), above, as equally applicable to Plaintiffs' exaction claim. Plaintiffs accepted and received benefits under the Concurrency Agreement, including plat approvals for 442

47

residential units, and failed to challenge the County's decisions at any stage until pursuing this action.  A property owner or developer has no claim for exaction where it proposed, as part of its application, the construction obligation it now challenges. KMST, LLC v. County of Ada, 67 P.3d 56 (Idaho 2003).  In addition, to the extent Plaintiffs attempt to challenge the calculation of its proportionate share obligation, that calculation was submitted by SEDP's own consultant, and was not appealed. As such the claim must fail.  Id.

## IV.   **CONCLUSION**

For the reasons set forth herein, the County respectfully requests entry of an Order granting summary judgment to the County on all claims and counterclaims in this action, and entry of judgment in favor of the County.

Respectfully submitted,

/s/  Carly J. Schrader
GREGORY T. STEWART – Lead Counsel
Florida Bar No. 203718
CARLY J. SCHRADER
Florida Bar No. 14675
MATTHEW R. SHAUD
Florida Bar No. 122252
Nabors, Giblin & Nickerson, P.A.
1500 Mahan Drive, Suite 200
Tallahassee, Florida 32308
(850) 224-4070
(850) 224-4073 (Facsimile)
gstewart@ngnlaw.com
cschrader@ngnlaw.com
mshaud@ngnlaw.com
legal-admin@ngnlaw.com
**ATTORNEYS FOR**
**DEFENDANT/COUNTER-PLAINTIFF**
**ST. JOHNS COUNTY, FLORIDA**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed with the U.S. District Court, Middle District of Florida, via the CM/ECF system, which will also serve a copy to all counsel of record, on this 26th day of April, 2024.

/s/  Carly J. Schrader
CARLY J. SCHRADER

49